**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Mary Peggy MOORE, Defendant–**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lee Roy WILEY, Defendant–Appellant.**

Nos. 94–30453, 94–30454.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 16, 1995.

Decided June 4, 1996.

David Z. Nevin, Nevin, Kofoed & Herzfeld, Boise, Idaho, for defendant-appellant Mary Peggy Moore.

Thomas J. McCabe, Westberg, McCabe & Collins, Boise, Idaho, for defendant-appellant Lee Roy Wiley.

George W. Breitsameter, Assistant United States Attorney, Boise, Idaho, for plaintiff-appellee.

Before: REINHARDT, TROTT and TASHIMA,* Circuit Judges.

Opinion by Judge TASHIMA; Concurrence by Judge REINHARDT; Dissent by Judge TROTT.

TASHIMA, Circuit Judge:

These are consolidated appeals by appellants Mary Peggy Moore ("Moore") and Lee Roy Wiley ("Wiley") (collectively "defendants") from their convictions for making a false statement in connection with the purchase of a firearm under the Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 922(a)(6), and for conspiracy, 18 U.S.C. § 371, to violate the GCA. Moore also appeals from her sentence. Defendants contend, *inter alia*, that the government's proof was insufficient as a matter of law to constitute a crime. We agree and therefore reverse their convictions.

### BACKGROUND AND FACTS

On January 20, 1994, Bobby Moore ("Bobby"), a juvenile, shot and killed an Idaho police officer with a .25 caliber handgun. The officer's death generated a large amount of publicity. The publicity resulted in a commitment to investigate and charge, if possible, those individuals responsible for providing Bobby with the weapon.

On September 2, 1993, Bobby and a friend entered the Little Bit of Everything Pawnshop, a federally-licensed firearms dealer, to "look around." Bobby was 14 years of age and his friend was 15. While browsing through the merchandise, the boys' attention focused on a .25 caliber handgun in the weapons section of the store. The store clerk approached the boys and asked them to depart the premises, as juveniles were neither permitted in the store nor permitted to purchase firearms without their parents.

Undaunted, Bobby set about to obtain the handgun. Bobby first went to Moore, his mother, and asked her to purchase the weapon for him. It was not unlawful in the State of Idaho for a parent to purchase a handgun for her minor child. Idaho Code § 18–3302A

(1990). Moore refused to purchase the weapon herself for Bobby. She said that she did not want her name on the papers, he could hurt somebody, and she didn't think he needed the gun. Moore, however, agreed to pawn Bobby's "boom box" for him, so that he would have the money available to purchase a weapon. Moore pawned the radio, and gave Bobby the cash.

The next day, Moore drove Bobby and his friend to Wiley's residence. Wiley, nicknamed "Grandpa," was known for his good nature and his reputation for always doing favors for the neighborhood children. The boys convinced Wiley to purchase the weapon for Bobby after Bobby told Wiley he had his mother's permission and Wiley could "keep the change." The threesome returned to Moore's vehicle and she drove to the pawnshop. On the way to the pawnshop, Wiley asked Moore whether the purchase of the gun was alright with her, to which Moore replied that it was fine.

Upon arriving at the pawnshop, Moore remained in the vehicle while Wiley, Bobby and his friend went inside. At the gun counter, Wiley asked to see the .25 caliber handgun on display. When the clerk inquired as to whom the gun was for, Wiley responded that the gun was for Bobby, but that he was Bobby's "grandfather" and would keep the gun until Bobby was 21. The clerk inquired as to the whereabouts of Bobby's mother, to which Bobby responded, "She's in the car." The clerk then asked to speak with Bobby's mother.

Bobby went to the car and asked his mother to come into the shop. Moore stepped into the doorway of the shop, made eye contact with the clerk, and said, "His grandfather is buying the gun for him. He's going to hold it until he's 21, and everything is fine with me."

Here, we must briefly digress to explain relevant information published by the Bureau of Alcohol, Tobacco and Firearms ("BATF") to inform dealers (and the general public) on how to comply with federal gun laws. The

---

* At the time of oral argument, Judge Tashima was a United States District Judge for the Central

District of California, sitting by designation.

BATF distributes to firearms dealers publications called "Industry Circulars." One such Circular, effective at the time of this sale, read:

> The Gun Control Act of 1968 does not necessarily prohibit a dealer from making a sale to a person who is purchasing a firearm for another person. It makes no difference that the dealer knows that the purchaser will later transfer the firearm to another person, so long as the ultimate recipient is not prohibited from receiving or possessing a firearm.

BATF Industry Circular 79–10, *reprinted in* (Your Guide To) FEDERAL FIREARMS REGULATION 1988–89, at 78. The same Circular also informed firearms dealers about the legality of sales involving parent and child: .

> A dealer may lawfully sell a firearm to a parent or guardian who is purchasing it for a minor child. The minor's subsequent receipt or possession would not violate Federal law even though the law does prohibit a dealer's direct sale to the underage person.

BATF Industry Circular 79–10. Another part of the BATF publication informs the dealer:

> A parent or guardian may purchase firearms and ammunition for a juvenile. GCA age restrictions are intended only to prevent juveniles from acting without their parents' or guardians' knowledge.

(Your Guide To) FEDERAL FIREARMS REGULATION 1988–89, at 84.

After Moore's cameo appearance at the pawnshop, the clerk proceeded with the sale of the firearm. As required by the GCA, the clerk asked Wiley to complete and sign BATF Form 4473 ("BATF Form"). The BATF Form enables the dealer to determine whether the purchaser (the "transferee (buyer)" in the words of the form) is able legally to buy a gun. By signing the form, the buyer acknowledges "that the making of any false statement with respect to the transaction is a crime punishable as a felony."

On the reverse side of the BATF Form is a section entitled "IMPORTANT NOTICES TO TRANSFEROR (SELLER) AND TRANSFEREE (BUYER)," which reads:

> WARNING–The sale or delivery of a firearm by a licensee to an eligible purchaser who is acting as an agent, intermediary or "straw purchaser" for someone whom the licensee knows or has reasonable cause to believe is ineligible to purchase a firearm directly, may result in a violation of the Federal firearms laws.

BATF Form (reverse side).

Wiley filled out the BATF Form and in the space provided stated that he was the "transferee (buyer)" of the weapon. Wiley paid for the firearm with money ($45.00) provided to him by Bobby and the transaction was completed. Wiley, Bobby and friend then returned to the vehicle where Wiley gave the firearm, receipt and paperwork to Moore. At some later point, Moore gave the firearm to Bobby.

After the shooting death of the officer, Moore and Wiley were indicted for violation of: (1) 18 U.S.C. § 922(a)(6), knowingly making a false statement to a licensed firearms dealer intended or likely to deceive the dealer with respect to any fact material to the lawfulness of the sale; and (2) 18 U.S.C. § 371, conspiracy fraudulently to acquire a firearm in violation of 18 U.S.C. §§ 922(a)(6) & (b)(1).

A jury returned guilty verdicts against both defendants on both counts. The court denied defendants' post-trial motions for, *inter alia*, judgment of acquittal and a new trial. Both defendants have timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

The government prosecuted Wiley and Moore under the "straw man" doctrine, a judicial gloss on the GCA, which prohibits the sale of firearms through third-party intermediaries to persons ineligible under the GCA to purchase firearms themselves.[1] Ac-

1. Categories of persons ineligible to purchase firearms from federally-licensed dealers under the GCA include: (1) minors; (2) persons by whom the purchase or possession of a firearm would violate applicable state law or local ordinance; (3) nonresidents of the state in which the firearms dealer is located (except for certain in-person sales); (4) persons under indictment for, or who have been convicted of, a crime punishable by more than one year imprisonment; (5)

cording to the government's theory, Bobby was the "true purchaser" of the firearm and Wiley was the "straw purchaser" employed in a conspiracy to circumvent the ban on firearms sales to minors under the GCA. To that end, the government maintains, both Wiley and Moore falsely and illegally represented that Wiley, and not Bobby, was the true purchaser of the firearm. The government argues that only Moore herself could have lawfully purchased the gun for Bobby.

This case presents an issue of first impression. We must determine whether the purchase of a firearm for a minor by a third party acting with parental consent constitutes an illegal "straw man" transaction: Specifically, whether a minor whose parent consents to the purchase of a firearm by a third party is nevertheless ineligible to acquire or possess the weapon. We note some discrepancy in the manner in which the term "straw man" transaction is used. Most courts seemingly use the term to refer only to illegal transactions—those resulting in the transfer of a firearm to a person who is prohibited by law from being a purchaser or possessor. The BATF Form, however, strongly suggests that a "straw man" is an intermediary or agent acting on behalf of any other person, and that straw-man transactions include lawful, as well as unlawful, third-party transactions. We use the term "straw man" throughout this opinion to refer both to lawful and unlawful third-party transactions and, when appropriate, we distinguish between the two categories.

## DEFENDANTS' CONTENTIONS

Defendants contend that the evidence was insufficient as a matter of law to convict

them of conspiracy and false statements in connection with the acquisition of a firearm, in violation of 18 U.S.C. §§ 371, 922(a)(6) & 922(b)(1). They argue that, given Moore's consent, what Wiley and Moore planned to do with the gun was not unlawful under either federal or Idaho law.[2] Because the object of their "conspiracy" was not a crime, they did not violate 18 U.S.C. § 371. They argue further that, as a matter of law, the government did not prove the element of materiality under § 922(a)(6). Defendants contend that because the sale was not unlawful, any false statements they may have made were not "material to the lawfulness of the sale."[3]

### I

The false statements provision of the GCA, in relevant part, reads:

> It shall be unlawful—
>
> (6) for any person in connection with the acquisition or attempted acquisition of any firearm ... from a ... licensed dealer ... knowingly to make any false or fictitious oral or written statement ... intended or likely to deceive such ... dealer ... with respect to any fact *material to the lawfulness of the sale* or other disposition of such firearm....

18 U.S.C. § 922(a)(6) (emphasis added).

Under the government's theory of the case, defendants' oral and written statements were material because they were intended to and did mask an illegal "straw" transaction in violation of § 922(b)(1), which prohibits the sale of a firearm by a licensed dealer to "any individual who the licensee knows or who has

fugitives from justice; (6) illegal drug users and addicts; (7) mental defectives; (8) illegal aliens; (9) persons who have been dishonorably discharged from the Armed Forces; and (10) persons who have renounced United States citizenship. *See* 18 U.S.C. § 922(b) & (d).

2. At the time of the incidents in this case, Idaho law did not prohibit Wiley from transferring the gun to Bobby with his mother's oral permission. Idaho Code § 18–3302A (1990). Nor did federal law explicitly prohibit such a transfer. However, Idaho Code § 18–3302A was amended in 1994 to require the *written* permission of a parent, 1994 Idaho Sess. Laws, ch. 369, § 1 at 1186, and

Congress, in the Violent Crime Control and Law Enforcement Act of 1994, amended the GCA to make it illegal for anyone under 18 to possess a handgun without the *written* permission of a parent. Pub.L. No. 103–322, § 110201, 108 Stat. 1796, 2010–11 (1994) (codified at 18 U.S.C. § 922(x)(1)(A) & (3)(A)(iii)).

3. In light of our disposition of these basic contentions, we need not reach defendants' numerous other contentions, including the issue of *Gaudin* error with respect to the element to materiality. *See United States v. Gaudin*, —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

reasonable cause to believe is less than eighteen years of age. . . ." The illegal "straw man" transaction theory also underlies the conspiracy charge. Accordingly, if the transaction was not illegal, the statements were not material, and no violation of § 922(a)(6), including the one alleged in the conspiracy charge, could stand. We therefore first examine the question of the alleged illegal "straw man" transaction.

## II

The text of the GCA nowhere mentions sales to "straw men" or third-party intermediaries. Nevertheless, in order to effectuate the statute's purpose, federal courts have banned "straw man" sales when the intended recipient is prohibited from purchasing or possessing the weapon involved. *See Perri v. Department of the Treasury*, 637 F.2d 1332 (9th Cir.1981).

> One purpose of the Act is to "keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976). Prohibiting sham or "straw-man" purchases serves this purpose. This occurs when a lawful purchaser buys for an unlawful one. This court has said that a dealer who sells a gun knowing, or with reason to know, it is for an unlawful possessor, violates the Act.

*Id.* at 1336. *See also United States v. Howell*, 37 F.3d 1197, 1202 (7th Cir.), *mandate recalled for limited purpose of permitting appellants to file petitions for rehearing*, 37 F.3d 1207 (7th Cir.1994), *cert. denied*, ——. U.S. ——, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995); *United States v. Straach*, 987 F.2d 232, 239 (5th Cir.1993); *United States v. Hern*, 926 F.2d 764, 768 (8th Cir.1991); *United States v. Lawrence*, 680 F.2d 1126, 1128 (6th Cir.1982); and *United States v. Brooks*, 611 F.2d 614, 617 (5th Cir.1980). Although the conduct in these cases found to constitute illegal "straw man" sales varies, all of them involve sales where the intended recipient is either a convicted felon or a nonresident.[4]

There is no reported case in which a minor's parent has been deemed an illegal "straw" purchaser for the minor. The BATF's interpretations of the GCA have always acknowledged parental purchases as an exception to the ban on sales to minors. At trial, a BATF agent testified that it is not illegal for a parent to buy a gun for a 14–year–old child with the child's own money. The agent testified that in doing so, the parent would be required to list his or her name as the "transferee (buyer)" on the BATF Form. This would not be a false statement even if the parent intended immediately to turn over the gun to the child.

## III

The legislative history of the GCA clearly requires the exception to the ban on firearms sales to minors recognized by the government—the purchase of a firearm for a minor by the minor's parent. This same legislative history likewise requires an exception to the ban on firearms sales to minors when the purchase is made by a third party with the consent of the minor's parent. Congress simply did not intend to criminalize acquisition of firearms by minors where the parent knows of and consents to the purchase.

The report of the Senate Judiciary Committee on the GCA listed among the serious national problems addressed by the legislation the acquisition of firearms by "juveniles *without the knowledge and consent of their parents or guardians* . . . ." S.Rep. No. 1097, 90th Cong., 2nd Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N., 2112, 2114 (emphasis added). The report elaborated:

> The *clandestine* acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country. The controls proposed in the title are designed to meet this problem and to substantially curtail it.

*Id.* at 2167 (emphasis added).

The committee report made clear that Congress did not intend to frustrate all gun acquisitions by minors:

---

4. *But see United States v. Ortiz–Loya*, 777 F.2d 973, 975 (5th Cir.1985) (affirming convictions under § 922(a)(6) of "straw men" who pur-chased firearms on behalf of an *eligible* purchaser and possessor who had misplaced his state identification).

[U]nder the title, a minor or juvenile would not be restricted from owning or learning the proper usage of the firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.[5]

*Id.*

There is no indication that Congress intended to limit the exception for the purchase of a firearm for a minor exclusively to purchases made by the parent himself or herself. What the legislative history indicates is that Congress considered parental permission sufficient to allow a third party to purchase the firearm on behalf of a minor. The Senate Judiciary Committee's report clearly indicates that Congress' purpose was only to prohibit those acquisitions of firearms by minors that are "clandestine" or made "without the knowledge and consent of their parents."

## IV

We do not find the transaction in this case to constitute an illegal "straw man" transaction because to do so would be contrary to legislative intent, as well as "longstanding principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of the defendant...." *Hughey v. United States*, 495 U.S. 411, 422, 110 S.Ct. 1979, 1985, 109 L.Ed.2d 408 (1990) (citation omitted). As the Court stated in *Moskal v. United States*, 498 U.S. 103, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990):

[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to "the language and structure, legislative history, and motivating policies" of the statute.

*Id.* at 108, 111 S.Ct. at 465 (emphasis in original) (citations omitted). Statutory construction expanding criminal liability *beyond* the express terms of a statute is disfavored, absent strong indications of legislative purpose. *See Crandon v. United States*, 494 U.S. 152, 160, 110 S.Ct. 997, 1002, 108 L.Ed.2d 132 (1990) ("Because construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text.").

■■■ "Straw man" sales are prohibited only to the extent that such prohibition effectuates the purposes of the statute. *See Perri*, 637 F.2d at 1336; *Lawrence*, 680 F.2d at 1128 (permitting such straw transactions "would be tantamount to a repeal of those provisions"). The parental permission for the purchase in the case at bench creates a fact pattern as to which neither the text of the statute nor its legislative history clearly discloses that the GCA was intended to apply. The relevant legislative history, at best, only casts doubt on the materiality of defendants' representations. The facts of this case should not be found to constitute an illegal "straw man" transaction.[6] Instead,

5. In an effort to show that Congress' intent was to curtail the sale of firearms to minors in general, the government cites passing references to juveniles and juvenile crime in the Senate committee report and floor debate. These references do not override the significance of the more specific discussions of juveniles in the committee report. The government also cites dicta in case law to the same effect. *E.g., Huddleston v. United States*, 415 U.S. 814, 827, 94 S.Ct. 1262, 1270, 39 L.Ed.2d 782 (1974) (quoting Senator Tydings' statement on the Senate floor that Congress intended the statute to "reduce access to handguns for criminals, juveniles, and fugitives"). These cases did not confront the issue of the scope of the statute's ban on sales to juveniles.

6. Not only did the minor's mother express her consent to the purchase, both to the third-party purchaser, Wiley, and the firearms dealer, but it

is uncontested that Wiley transferred the firearm to the minor's mother and not to the minor.

According to the dissent, when Moore purported to consent to the transaction, she was "lying." (Dissent, pp. 1575–76.) The concept of lying is simply inapplicable to the giving of consent by one person directly to another. If an individual objectively manifests approval to another person, it is irrelevant what unspoken reservations she may have or even what she really believes. Here, Moore manifested her approval directly to the dealer. By doing so, she gave her consent to the sale. *See, e.g., Merced County Sheriff's Employees' Ass'n v. County of Merced*, 188 Cal. App.3d 662, 233 Cal.Rptr. 519, 525–26 (1987) ("the existence of mutual assent is determined by an objective rather than a subjective standard, i.e., what a reasonable person would believe from the outward manifestations of consent," and "the outward manifestations or expressions

the principle of lenity should apply.[7]

## V

■ Having concluded that the transaction in this case was not an illegal "straw man" transaction, the conspiracy charge, which is based on the transaction itself, cannot stand. Neither can the charge that defendants violated § 922(a)(6) by making false statements material to the lawfulness of the sale of a firearm. Because the purchase for the minor by Wiley was lawfully made with the consent of the minor's parent, Moore, defendants' false statements were not material to the lawfulness of the sale. As a matter of law, the statements could not have had the capacity to deceive the firearms dealer into believing an unlawful sale was lawful. Therefore, defendants' false statements did not violate the statute and cannot serve as the basis for the remaining portion of the conspiracy charge.

of consent ... is controlling, i.e., [consent] is gathered from the reasonable meaning of words and the acts of the parties, not from their unexpressed intentions or understanding") (citation omitted).

Moreover, the dissent ignores a fundamental requirement for an aiding and abetting conviction—that the aider and abettor act "knowingly and intentionally." Thus, for Moore to have been convicted under the government's aiding and abetting theory, the jury necessarily had to find that she consented to Bobby's acquisition of the firearm; otherwise, she could not have acted knowingly and intentionally. The dissent attempts to have it both ways: That Moore did not change her mind and "lied" when she gave her consent so that there was no consent at all; however, that she acted knowingly and intentionally in aiding and abetting the transaction, but that her knowing and intentional actions did not amount to "consent."

The dissent also postulates the bizarre proposition that Moore's consent was a "fraud." (Dissent, pp. 1577–78, 1580.) Assuming it is legally possible to give "fraudulent consent," even the government makes no such contention. As the dissent itself points out (Dissent, pp. 1576–77), the government's theory was that Moore aided and abetted Wiley's straw man purchase. This theory forecloses the possibility that Moore could consent to the transaction at all, much less give fraudulent consent. The novel doctrine of fraudulent consent has been created by the dissent out of whole cloth.

7. We note two other cases under § 922(a)(6) where the principles of lenity were considered.

## CONCLUSION

While the shooting death of the police officer was tragic, and Moore may have exercised extremely poor parental judgment in permitting her son to have the handgun, neither we nor the BATF[8] can criminalize what Congress did not. We hold that the judicially created "straw man" doctrine prohibits third-party purchases of firearms for persons prohibited by the GCA from purchasing and possessing firearms themselves. We also hold, however, that the doctrine does not prohibit such purchases for a minor if made with the parent's knowledge and consent.[9] Because the underlying transaction was not unlawful, defendants did not engage in a conspiracy fraudulently to acquire a firearm in violation of the statute, and defendants' false statements did not violate the statute, as charged in both the substantive and conspiracy counts.

The convictions of Moore and Wiley are *REVERSED*.

In *Huddleston*, 415 U.S. at 831, 94 S.Ct. at 1272, the Court rejected lenity because the text of § 922(a)(6) clearly applied to the facts of that transaction. In *United States v. Anayá*, 615 F.Supp. 823, 825–26 (N.D.Ill.1985), the district court rejected lenity because it concluded from a review of the legislative history that the defendant's misrepresentation was clearly material to the lawfulness of the transaction.

8. All of the actions the dissent characterizes as "unlawful" are made unlawful only by the BATF and defendants' failure to comply with the BATF Form. The dissent cannot, and does not, cite to any specific statutory language making it a crime for a parent to consent to a third-party acquisition of a firearm for her minor child.

Further, the question of "responsible parenting" is not before us. The GCA does not make irresponsible parenting a crime.

9. As noted, neither the transaction at issue nor the ultimate possession of the firearm by the minor was unlawful under state law. Thus, we need not, and do not, address the situation where the transaction or possession by the minor is in violation of state law. *See* 18 U.S.C. § 927 (Congress in the GCA did not intend "to occupy the field .... to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.").

REINHARDT, Circuit Judge, concurring:

I agree fully with Judge Tashima's opinion. I note only that Congress, not the courts, has the authority to determine whether children may possess dangerous weapons if their parents consent. For better or for worse, it has said that they may. Surely, we cannot undo that legislative judgment. In this case, the mother's consent was manifest. In fact, she communicated it directly to the weapons dealer. Whatever her inner reservations may have been, she gave her consent when it counted most—at the time of the sale. Thus, under the law, none of the charged offenses occurred.

TROTT, Circuit Judge, Dissenting:

## I

### The Straw Man Purchase

At the time of the purchase of the firearm at issue, Mary Peggy Moore most certainly had the legal authority to buy it for her 14 year old son, had she chosen to do so. The government has never disputed this proposition.[1] Federal and Idaho law both would have accommodated such a purchase. All she had to do was exercise her judgment in favor of the purchase, walk into the store, place her name on the required form in the box marked "transferee," put her *or* her son's money on the counter, and give the gun to her son. Under these circumstances, she probably would not have had to touch the gun herself to make the transaction valid. This is the essence of the transaction Idaho and Congress had in mind when they conditioned the eligibility of juveniles to acquire a firearm on the approving judgment and involvement of a parent or guardian. The sine qua non of a juvenile's eligibility to acquire a firearm is the genuine approval of a parent or a guardian. Without such approval and involvement, a juvenile is ineligible for this privilege.

---

1. Judge Quackenbush asked the prosecutor before the trial if he had "any disagreement [under state or federal law] with the fact that Mrs. Moore as the mother, could, if she had a firearm or if she wanted to, she could buy a firearm and give it to Bobby Moore." The prosecution said,

In the case before us, however, Mrs. Moore turned down such a straightforward acquisition because she knew her gang member son was irresponsible and dangerous. As Judge Tashima accurately says, "Moore refused to purchase the weapon herself for Bobby. She said she did *not want her name on the papers,* he could hurt somebody, and she didn't think he needed the gun." (emphasis added). But the actual testimonial evidence on this point is far more revealing than Judge Tashima's characterization of it. The testimony comes from Jason Marks, Bobby's friend who accompanied Bobby to the pawn shop and who was present during Bobby's subsequent conversations with his mother. From this testimony emerges a striking fact: *Mrs. Moore* is the person who told her son he should use a straw man to accomplish his purpose. This is what happened.

A. (By Jason Marks) Well, we [Bobby and Jason] left the pawn shop and we were trying to figure out a way that *he* could get the money to get the gun....

Q. (By the prosecutor) So what did you do as far as trying to get the money?

A. Well, we walked back to his house and I sat down and he was looking around his house at stuff that he could sell or get rid of to get some money....

Q. Okay. When Bobby first talked to Mrs. Moore, he was there looking for something to sell, looking at the boom box. When he first talked to his mom, what did he say? What did he ask her?

A. He asked if she would pawn this for him, and she said, no, and they got in an argument.

Q. Okay, and tell us what else was said.

A. Then Bob said why he wanted to pawn it and stuff, and—

Q. Did Bobby ask her to pawn it or hawk it for anything particular?

A. Yeah, for the gun.

Q. What? For the gun?

---

"No," to which the court responded, "But that's not what she's charged with." Moreover, the jury was instructed that Idaho law "permitted a parent to deliver a firearm to a minor child ...," and that no federal law "prevented or prohibited" such a delivery or transfer.

A. Yeah, and Bob's mom said she didn't want to do it because she didn't want her name on the papers and he could hurt somebody and she didn't think he needed a gun. But Bob has a way of talking people into things, and so he kind of threw a tantrum and got all mad, and finally his mom said that she would do it.

Q. Said she would do what?

A. Pawn the CD Player.

Q. Did she say she would pawn the CD player for the gun, or just pawn the CD player?

A. *Just pawn the CD player and he would have to figure out a different way of getting the gun because she didn't want her name on the papers.*

Q. That's what he told her; is that correct? *He would have to get someone else to get the gun?*

A. *Yeah.*

(emphasis added).

Why did Mrs. Moore turn down her son's request? Because she knew he was a dangerous delinquent. Thus, she *rejected* the lawful option available to her. In this respect, the system of firearms control put in place by Congress worked, but only partially.

According to the jury, Mrs. Moore's next step in this process, unfortunately, was to aid and assist her son with a transaction which both Federal and Idaho law expressly forbid: the purchase of the coveted firearm by the minor Bobby himself pursuant to a plan hatched by him to circumvent the federal laws designed to prevent juveniles from purchasing weapons. To such a separate transaction by a 14 year old Mrs. Moore could *not* consent because the law prohibits it. With all respect to the majority, they simply miss this decisive point. Once she said "no," refused to put her name on the papers, and told him he would have to find "a different way" involving "someone else" to get a gun, unless she later changed her mind, Mrs. Moore's authority to arm her son ended, as did her son's lawful ability to obtain the coveted handgun. Thus, Mrs. Moore's assistance to her son that enabled him to acquire the money to purchase the gun "a different way" and through "someone else" was mani-

festly improper. When she helped him get the money for this gun, she became an accessory and a principal to *his* intended crime as well as a coconspirator.

Her first step in her son's unlawful scheme was to assist him with his plan to use a straw man and a dupe, Lee Roy Wiley. Unlike Mrs. Moore, Lee Roy Wiley had no lawful authority to purchase this firearm for Bobby. Wiley was neither Bobby's parent, blood relative, or guardian. Had he gone into the store and told the truth—I'm just an acquaintance being paid to buy this handgun for my juvenile companion—his attempt would have failed. In fact, payment in compensation for his perfidious role was the factor that convinced Wiley to go along with this charge:

Q. (By the prosecutor) Was anything offered to Mr. Wiley?

A. (By Jason Marks) Yeah, Bobby said he could keep the change.

Q. He could keep the change?

A. Yeah, from buying the gun.

Q. Okay, so with that, Mr. Wiley agreed to do that?

A. Yeah.

Mrs. Moore lied to Wiley when she told him the purchase was "fine with her." It wasn't. She had refused and continued to refuse to buy the gun for him. If, on the other hand, she meant it was okay with her that Bobby independently buy a gun for himself, her sentiment was irrelevant because the law neither accommodates nor honors such a purpose. Such a statement might reflect on Wiley's state of mind or the store clerk's behavior, but *not* on the legality of the purchase. More on this consequential point later.

The next step in this charade was to deceive the store clerk. While Mrs. Moore deliberately stayed in the car, the "someone else" straw man Wiley lied to the clerk about who he was, who was really buying the gun, and what was going to happen to it. Mrs. Moore's plan was to stay out of the store and stay out of sight. Her role was to drive the car. However, the clerk upset her plan by exercising good judgment in trying to make sure that this purchase for a juvenile was

lawful. Mrs. Moore responded by lying to the clerk and covering for the straw man Wiley. In so doing, she defeated both the clerk's good intentions *and* the law. Had she not intervened with false statements, the transaction would have died on the spot, and possibly Officer Ronald Wade Feldner would have lived.

Her first false statement to the clerk was that the paid straw man Wiley was her son's grandfather: a lie. Her second false statement to the clerk was that Wiley was going to hold the gun for Bobby until he was 21: a lie. The third lie was that "everything is fine with me." It wasn't fine with her at all. She made that clear to Bobby (1) when he asked her to buy the gun for him and she told him he might hurt someone, (2) by conspiring to procure a straw man's signature on the form, and (3) by attempting to wait in the car while the crime was being committed. Because of these material lies, the clerk was deceived into allowing the straw man Wiley, who also was lying about every material aspect of this unlawful transaction, falsely to enter his name, Lee Roy Wiley, in the space marked "TRANSFEREE'S (Buyer's) SIGNATURE," when the buyer was in fact the ineligible Bobby Moore. This is the final lie and material false statement for which both Mary Peggy Moore and Wiley are criminally responsible. Lee Roy Wiley was not the "transferee buyer," Bobby Moore was.

Mrs. Moore's final act was to hand over the illegally purchased gun to Bobby even though she didn't want him to have it. So much for parental supervision. That it passed through her hands under these circumstances is of no moment in establishing lawful consent. Bobby Moore simply laundered this illegal straw man purchase through the dirty hands of his irresponsible parent and witless acquaintance. What this case boils down to in the light of the verdict handed down by the jury is Wiley as an illegal straw man buying the gun for Bobby, knowingly aided and abetted with specific intent by his mother. With these facts, it's no wonder the jury convicted her of making false statements in connection with the purchase of a firearm, and for conspiracy.

Judge Tashima's opinion rests entirely on the notion—rejected by the jury—that when Mrs. Moore told Wiley and the store clerk that "everything was fine with her," she had changed her mind from her original position against this acquisition. This view of the evidence, of course, was vigorously presented to the jury as Mrs. Moore's sole defense, which was that because she consented to the purchase, there was no crime committed, period. The defense argued that Wiley was just her lawful agent implementing her decision, not a straw man, and that as a matter of law the statute was not violated. Whether she did change her mind, of course, was a pure question of historical fact for the jury to decide, not us on appeal. And decide it the jury did, against Mrs. Moore's contentions. The instructions given to them perfectly describe both competing views of the evidence and render this point perfectly clear:

> The government contends that Mary Peggy Moore is not charged with any unlawful transfer of the firearm to her son, but rather is *charged with aiding and abetting Lee Roy Wiley on being a principal in a straw man purchase* of a firearm in the place of the prohibited minor, James Robert Lee Moore, who the government contends was the true purchaser. *The defendant Mary Peggy Moore denies that she participated in a straw man purchase or that a straw man purchase took place.* The defendants Lee Roy Wiley and Mary Peggy Moore cannot be found guilty of any charge pending against them in this case solely because they may have delivered the firearm to James Robert Lee Moore. The limited charges against the defendants in Count 1 and 2 are that *James Robert Lee Moore was the true 'purchaser' of the firearm and that the defendants served merely as "strawmen"* for the purchase of the firearm in the place of James Robert Lee Moore.

(emphasis added). Under these circumstances, a verdict of guilty can mean only that she did *not* change her mind and that a straw man purchase *did* take place. The choices presented by the government and Mrs. Moore were mutually exclusive. The defense failed in its attempt to persuade the jury of the factual basis necessary to support

its claim that the sale was legally proper based on parental consent. In other ·more correct words, the factual argument that Mrs. Moore properly approved the acquisition of the gun was not even .sufficient to raise in the mind of any one of the twelve jurors a reasonable doubt against the prosecution's claim that Bobby Moore was buying it for himself because his mother turned him down. Thus, the premise from which Judge Tashima argues his case is irreconcilable with the verdict. The majority's holding is tantamount to rejecting the jury's verdict as based on insufficient evidence.

If Judge Tashima is correct about Mrs. Moore changing her mind, why did she wait in the car? Why all the lies about Wiley's relationship to Bobby? Why pay Wiley? Why the involvement of Wiley at all? Why defraud the reporting ·form? All Mrs. Moore's hollow words to Wiley and the clerk demonstrate is *adherence* to her original decision *not* to go on the papers or to sanction the acquisition of this gun. Construing her words otherwise is like saying that a robber's statement, "Give me all your money," is really a request for a charitable contribution. Mrs. Moore's words and her conduct must be judged, as did the jury, in context. The verdict in this respect is fully supported by overwhelming evidence and thus immune on appeal. Judge Tashima's view of the facts requires us to accept a series of lies by Mrs. Moore at face value, and then to put a spin on the lies not merited by the facts *or* the jury's verdict.

In an attempt to bolster his claim that Mrs. Moore consented to this purchase, Judge Tashima borrows from another context the doctrine that whether an individual consents to something is to be measured objectively, in this case, by the plain meaning of what she said to the clerk. If Judge Tashima is correct, the very fraud itself becomes the vehicle that relieves Mrs. Moore of the fraud with which she is charged! This misuse of a doctrine removed from the reliance context for which it was intended is nothing short of bewildering. The fraud has cancelled the fraud. In my judgment, ·the clerk's reliance on Mrs. Moore's statements has absolutely *no* relevance to the charge that the statements themselves were false.

Not only is the doctrine grossly out of place in ·a suit charging fraud, but the. strange result it produces ignores the intent of Congress, the .purpose of the reporting form, the law prohibiting false statements, the straw-man doctrine, the facts· of the case, Wiley's signature on the misleading transaction form, and the conspiracy in which Mrs. Moore, Wiley, and her son were engaged.

In summary, to characterize this case as involving "parental consent" or "parental permission" based on the notion either (1) that Mrs. Moore changed her mind, or (2) that the fraud she perpetrated relieves her of the fraud she committed strong-arms the factual record supporting the verdict and the verdict itself. To underscore this point, I refer again to the unrebutted testimony of Jason Marks:

> Q. Did she [Mrs. Moore] say she would pawn the CD player for the gun, or just pawn the CD player?
>
> A. Just pawn the CD player and *he would have to figure out a different way [using someone else] of getting the gun because she didn't want her name on the papers.*

(emphasis added). A "different way" is indeed what Bobby Moore figured out, one strictly prohibited by law because he used a straw man to arm himself. This record read as a whole demolishes the idea that Mrs. · Moore changed her mind. The record demonstrates unequivocally that she did not. The jury heard the appellant's claim and flatly rejected it. A "different way" she ordered, and a "different way" it was, a way prohibited by the statutes.

BATF Industry Circular 79–10 says that a dealer "may lawfully sell a firearm *to a parent or guardian* who is purchasing it for a minor child." (emphasis added). It does *not* say that child can buy a firearm through a straw man who is not a guardian when his parent has refused to buy it for him. On the reverse side of the BATF Transfer Form, there is a "WARNING" that reads, "The sale or delivery of a firearm by a licensee to an eligible purchaser who is acting as an agent or intermediary or 'straw purchaser' [Wiley] for someone [Bobby Moore] the licensee

knows or has reasonable cause to believe is ineligible to purchase a firearm directly, may result in a violation of the Federal firearms laws." The relevant Senate Judiciary Committee report could not be clearer on one of the purposes of this law:

> The clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and citizens of this country. The controls proposed in this title are designed to meet this problem and to substantially curtail it.

S.Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968). U.S. Code Cong. & Admin. News p. 1397, 1400. The Committee Report accepted the idea that a juvenile could own a firearm, but only if "obtained for the minor or juvenile by the parent or guardian." *Id.* At the risk of beating this point to death, Mrs. Moore did not obtain the firearm for her son, she *enabled* him unlawfully to obtain it himself through a straw man. She was careful to keep her fingerprints off the transaction, her name off the form, and to divorce herself from the role of responsible parent contemplated by Congress when it made allowances for juveniles under proper supervision. The jury's unanimous verdict on this issue clearly establishes Bobby's ineligibility with respect to the purchase.

I cannot find anywhere in the law room for a parent or guardian who decides against doing what the law allows then to delegate whatever original authority she might have had to the minor or to "someone else" with no legal standing to make such a decision. If Mrs. Moore wishes to invoke the role of responsible parent as a shield to the gun control law, *she* must demonstrate that she acted as contemplated by the controlling statutes. This she has failed to do. Instead, she abandoned her role as a responsible parent envisioned by Congress and with it her entitlement to use that privileged status as a defense to these charges. The jury so found. Just as Wiley was a straw man, she was a straw parent. This behavior and this set of facts cannot be what Congress had in mind when it carved out an exception from these important gun control laws for parents and guardians. The evidence in this case is more than sufficient to sustain the convictions. In fact, the direct testimony of Jason Marks is uniquely overpowering to establish Bobby Moore's ineligibility to have this firearm.

Thus, I respectfully disagree with Judge Tashima's claim that applying the straw man false statements doctrine would not effectuate the purposes of this statute, to the contrary. The facts make it clear that Mrs. Moore did not and *never* would have signed the papers herself. In *Perri v. Dept. of Treasury,* 637 F.2d 1332, 1336 (9th Cir.1981) we said,

> One purpose of [the Gun Control Act of 1978] is to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous. *Barrett v. U.S.,* 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976). Prohibiting sham or 'Straw Man' purchases serves this purpose. This occurs when a lawful purchaser buys for an unlawful one.

Congress said it would allow Mrs. Moore to determine whether her son was a "potentially irresponsible and dangerous person," and to render him eligible to have a firearm. She denied him this privileged status. Congress certainly was correct when it stated that guns improperly in the hands of juveniles are a "serious problem for law enforcement": Bobby Moore took the gun and wantonly, deliberately, and purposefully murdered Officer Ronald Wade Feldner with it.

Stop for a moment to ask why Wiley was involved in this transaction. The illuminative answer disposes of the issue: Wiley was involved only because Bobby could not buy the gun for himself and because Mrs. Moore would not buy it for him, leaving Bobby legally ineligible to have it. Wiley is an archetypal straw man, and his involvement is the smoking gun that conclusively proves both the illegality of this purchase and the existence of the conspiracy. Without the straw man Wiley, this intended purchase by Bobby does not occur, and this firearm at least could never have been used by him to kill. The testimony of the clerk who sold the gun to Wiley is dispositive on this point:

> Q. (By the prosecutor) Jackie, if the truth were at that particular time that Mr. Wiley was not the grandfather, that he was not going to hold the gun until the boy was 21,

that he was merely an agent or an intermediary for Bobby Moore as the true purchaser in order to avoid the age restriction, would you have gone along with that sale?

A. (By the clerk) No, I would not have.

Q. Why not?

A. Because it's straw purchasing, and the boy is ineligible to have the gun.

The importance and integrity of the Firearms Transaction Record is at the heart of Congress' purpose " 'to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.' " *United States v. Pruner,* 606 F.2d 871, 874 (9th Cir.1979) (quoting S.Rep. No. 1501, 90th Cong., 2d Sess., 22 (1968) U.S. Code Cong. & Admin. News at 1400). As underscored by the Supreme Court,

> Information drawn from records kept by dealers was a *prime guarantee* of the Act's effectiveness in keeping these "lethal weapons out of the hands of criminals, drug addicts, mentally disordered persons, juveniles, and other persons whose possession of them is too high a price in danger to us all to allow." ... Thus, any false statement with respect to eligibility of a person to obtain a firearm from a licensed dealer was made subject to a civil penalty.

*Huddleston v. United States,* 415 U.S. 814, 825, 94 S.Ct. 1262, 1268–69, 39 L.Ed.2d 782 (1974) (emphasis added) (citations omitted).

Allowing a straw man to buy this gun for an ineligible purchaser and to defeat the information controls built into the reporting form manifestly frustrates the unmistakable intent of the statute. This fact pattern and irresponsible behavior is exactly what Congress had in mind in enacting this legislation. On its face, the transaction reporting form with Wiley's name on it misleads the government and law enforcement and is worse than useless. Judge Tashima's opinion guts the very purpose of the reporting form.

Accordingly, Judge Tashima's opinion is inconsistent not only with the statutes and our circuit's settled straw man doctrine, but it is also irreconcilable with the straw man doctrine as articulated in the Fifth, Sixth, Seventh, and Eighth Circuits. This leaves the law of the Ninth Circuit not only incorrect, but at odds with most of the rest of the nation as well as the intent of Congress in looking to the reporting form as the "prime guarantee" of the Act's effectiveness. In each of the other circuits, the proper focus of the straw man doctrine is the recipient's ineligibility to purchase a firearm and the integrity of the information presented to the seller. *See United States v. Ortiz–Loya,* 777 F.2d 973 (5th Cir.1985); *United States v. Hern,* 926 F.2d 764 (8th Cir.1991); *United States v. Lawrence,* 680 F.2d 1126, 1128 (6th Cir.1982); *United States v. Howell,* 37 F.3d 1197, 1202 (7th Cir.1994) *cert. denied* — U.S. ——, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995). In *Lawrence,* for example, the Sixth Circuit found determinative of straw man status that, like the case at hand, the transferee acted under the direction and control of the ineligible buyer, purchased weapons selected by him with his money, took a commission that showed agency, and had no intention of keeping the gun for himself. *Id.* at 1128. Here, and with grievous consequences, Judge Tashima's opinion relegates both Bobby Moore's legal ineligibility and the fraud on the reporting form to irrelevancy.

The irony is that the majority's opinion blesses this dishonorable transaction and allows an ineligible and murderous juvenile to obtain a firearm through a lying straw man when an adult cannot. The surprising secret of such an acquisition is not having a parent who obeys the law, but having a parent who steadfastly refuses to follow the law and who schemes instead to defeat it by suggesting to her son that he use a straw man to accomplish his unlawful purpose. This case stands for the bizarre and irrational proposition that because Mrs. Moore was generally empowered to arm her minor son, *he* could arm himself through a straw man even though she had explicitly confronted the critical empowering decision given to her by Congress and said, "no."

I respectfully believe that my able colleagues have been seriously led off the track by mistakenly looking at this as a who-can-buy-a-gun-for-a-minor case rather that what it is, a straw man, false statements, case.

The defendants were convicted of knowingly making false statements, not purchasing a gun for a juvenile. My colleagues erroneously conflate these concepts and fall into a Bermuda Triangle of their own making. The proof of their distraction lies in their bizarre claim that the fraud eliminates the fraud. The skillful *factually* based defense rejected by the jury has worked on appeal. I am unable, however, to fathom the source of the majority's distraction. Before the trial, the district court clearly spelled out the issues:

> The Court: But [parental authority is] not what we are here about. What we are here about is whether or not false statements were made in connection with the purchase of the firearm, and I don't think that the government's case against Mrs. Moore is that she got Wiley to purchase it, who gave it to her, who gave it to her son. I don't think that is an offense. The question being, whether or not she aided and abetted, or engaged in a legal [sic] agreement, conspiracy, to violate the federal law which prohibits false statements in connection with the purchase of the firearm.

The jury found beyond a reasonable doubt that Bobby bought the gun for himself and that contrary to the claims made by Mrs. Moore, a material false statement/straw man transaction did occur. The result reached by the majority simply lacks empirical and legal underclothes.

## II

### The Instructions on Materiality

Appellants Moore and Wiley appeal on a second ground. They argue that the district judge violated the *Gaudin* rule, *United States v. Gaudin*, — U.S. —, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), when he orally instructed the jury *inter alia* as follows:

> If the government establishes by proof beyond a reasonable doubt that James Robert Lee Moore was the true purchaser of the handgun and that Lee Roy Wiley was not, then the government has established that Lee Roy Wiley made a material false statement in connection with the purchase of the firearm. But I want you to keep in mind that making of a material false statement is just one of the elements of an offense, and I described those elements to you in the earlier instructions.

Jury Instruction No. 14 (excerpt).

*Gaudin* is a case involving allegations of criminal false statements in violation of 18 U.S.C. § 1001. The problem in *Gaudin* arose because the district court handled the issue of the materiality of the alleged false statements—which is an element of the crime—as a matter for the court to decide, not the jury. The court instructed the jury that "[t]he issue of materiality ... is not submitted to you for your decision but rather is a matter for the decision of the court. You are instructed that the statements charged in the indictment are material statements." — U.S. at —, 115 S.Ct. at 2313.

The Supreme Court held that such an approach to the issue and such an instruction violated both the Fifth and the Sixth Amendments to the United States Constitution which together "require criminal convictions to rest upon a *jury* determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at —, 115 S.Ct. at 2313 (emphasis added). The Court concluded by saying that "[t]he trial judge's refusal to allow the jury to pass on the 'materiality' of Gaudin's false statements infringed that right [to have a jury decide]." *Id.* at —, 115 S.Ct. at 2320. The rule of this circuit is that if such a constitutional error occurred, it was both "structural" and "plain" and requires reversal. *United States v. Gaudin*, 28 F.3d 943, 952 (9th Cir.1994), *aff'd*, — U.S. —, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

The question we must answer, therefore, is whether the part of the instruction of which the defendants complain withheld the element of materiality from this jury in violation of *Gaudin*'s rule. My answer is that it did not.

Unlike what happened in *Gaudin*, here the court did not withhold the materiality element from the jury. The jury was expressly told that materiality was an element of the charged offense, and that as an element of the crime it had to be proved beyond a reasonable doubt:

In order for a defendant to be found guilty of [making a false statement], the government must prove each of the following four elements beyond a reasonable doubt: ...; and third, *that the statement was intended or likely to deceive the firearms dealer with respect to a fact material to the lawfulness of the sale;* .... If you found that the government has established each of the foregoing elements against a defendant beyond a reasonable doubt, your verdict should be one of guilty against that defendant on this Count 2.

If you find that the government has not established all or any of the four elements by proof beyond a reasonable doubt against a defendant, your verdict should be one of not guilty on Count 2 against that defendant.

(emphasis added).

Moreover, the jury was instructed that "[t]he burden is always upon the government to prove guilt by proof beyond a reasonable doubt."

It is also noteworthy that when the instructions were being discussed with counsel before they were read to the jury, no one objected that the instruction now complained of violated the *Gaudin* rule, a rule established first by a three-judge panel of this court on June 22, 1993, and then affirmed en banc on June 21, 1994, more than two months before the trial. It is inconceivable that the able and experienced defense counsel in this case did not know of this rule, and they do not now claim ignorance at the time of the trial of it. Moreover, the district court offered to enhance the instructions on the materiality element by giving an additional instruction offered by counsel for Mr. Wiley, but the request was withdrawn. What happened between court and counsel during this conference sheds light on this issue:

Mr. McCabe: The [instruction] I offered was number twelve, which is Devitt and Blackmar, and it says it is material if it is relevant to the decision and is capable of influencing them, and what I'm concerned with there is *if we leave it wide open like that, even though beings a grandparent is not truly material to the transaction, they might decide that the false statement that was materially was saying that he was his grandfather.*

The Court: I'm willing to give you number twelve.

Mr. McCabe: I will withdraw it at this time.

The Court: All right. Any other exceptions/failures to give, Mr. McCabe?

Mr. McCabe: I don't believe so, judge.

(emphasis added).

Mr. Nevin, counsel for Mrs. Moore, also addressed Instruction No. 14 in this conference, and he too did not object on *Gaudin* grounds. What he said about the disputed language was not that it withdrew the materiality element from the jury's consideration, but that it was "a comment on the evidence."

From these exchanges, it is clear that no one believed during the trial that the disputed instruction violated *Gaudin*.

The *Gaudin* issue arose for the first time in a motion for a new trial after the chosen defense had failed. Counsel for Mr. Wiley argued to the court that "materiality is always an issue that needs to be submitted to the jury ...," to which the court responded, "I did submit it to the jury." To prove his point, the court then read the same instructions to counsel previously quoted in this opinion. Counsel's response was:

I understand, Judge. I concede all of those things. In terms of—and in fact you went further. When the jury came out with a question, you gave them an answer that included, yet again, an instruction to them that the government had to prove beyond a reasonable doubt that, quote, "That the alleged statement was of a mature material to the lawfulness of the sale." I concede all of that, judge.

Nevertheless, counsel made the same point that they make here, i.e., that the language in Instruction 14 had the effect of withdrawing consideration of this element for the jury's consideration. The court discussed

the matter with counsel and then disagreed, denying the motion for a new trial. The record viewed as a whole supports the court's conclusion: the question of materiality remained with the jury.

This leaves us, however, with the question of whether the jurors were mislead or confused by the dispute language in Instruction No. 14. They were not. How do we know this with certainty? Because during deliberations they sent a question to the judge inquiring about the interplay in the instructions between intent and materiality. This is the question

Count 2—Third Element [materiality], Instruction # 11.

"That the statement was intended or likely to deceive the firearms dealer....."

Does the "intention" and "likely to deceive" both need to be met in this element or just one met for this element to be satisfied.

[signed]

One can conclude from this question only that the jury understood that the element of materiality was for them to decide, and that they were attempting to decide it. There is no sign they believed or did otherwise.

Moreover, when the court answered the jurors' question, he told them again that this essential element was on *their* table for decision:

In response to your question, you are advised that the government has the burden of proving beyond a reasonable doubt that the Defendant under consideration knowingly and wilfully made, or aided and abetted the making of a false statement. The government must also prove beyond a reasonable doubt that the defendant knew the alleged statement was false. *The government must also prove beyond a reasonable doubt that the defendant intended his or her statement to deceive a firearms dealer and that the alleged statement was of a nature material to the lawfulness of the sale and that the alleged statement was of a nature which would deceive the dealer or would likely deceive the dealer.* ... This

Instruction sets forth four separate elements which the government must prove beyond a reasonable doubt.

Supplementary Instruction, given Sept. 15, 1994 (emphasis added). If the earlier statement in Instruction 14 might have been a problem, this certainly cured it. Thus, when I view the instructions "as a whole in the context of the entire trial to determine if they were misleading or inadequate to guide the jury's deliberation," *United States v. Perez*, 989 F.2d 1111, 1114 (9th Cir.1993), I conclude they do not suffer from this defect.

There is a reason, of course, that explains Mr. McCabe's withdrawal of his enhanced materiality instruction as well as both counsels' disinclination to get too close to the materiality issue as framed by the prosecution. As Mr. McCabe candidly admitted at oral argument, he did not want the jury precisely to focus on the materiality of the alleged false statements made by Mr. Wiley for fear that such a focus would distract the jury from the substance of the defense, which as described earlier in this opinion was that *none* of the statements made by Wiley and Mrs. Moore could qualify as material false statements because no crime was being committed in that Mrs. Moore approved of the purchase. As Mr. Nevin says in his excellent brief,

As we argue above, Idaho law protected the right of *any* third party to give a gun to a child of *any* age, with the parent's permission. Thus the statements that Mr. Wiley was Bobby's grandfather, and that the gun would be held until Bobby turned 21, were in no way "material to the lawfulness of the sale."

(emphasis in original). This tracks exactly the argument Mr. Nevin made to the jury at the end of the case, demonstrating also that the materiality element was considered by all to be in play and not to have been preempted by the court. In fact, materiality was the essence of both defendants' defense. With this in mind, to me it is absolutely clear beyond a reasonable doubt that the court's disputed statement in Instruction No. 14 read in context and measured against (1) the

evidence, (2) the substance of the defense, and (3) the verdict was completely harmless. *See Perez,* 989 F.2d at 1115–1116 (telling the jury that "carrying," for purposes of establishing the offense of carrying a firearm in relation to a drug trafficking offense, was shown conclusively if the firearm was within the defendant's reach was harmless beyond a reasonable doubt).

**2.** Their other claims are equally without merit, i.e., (1) the Court did not err in denying Mrs. Moore a sentencing adjustment for acceptance of

**CONCLUSION**

I would affirm the convictions of both Mrs. Moore and Mr. Wiley.[2]

responsibility; and (2) the Gun Control Act is neither constitutionally vague on its face or as applied.