UNITED STATES of America,
Plaintiff–Appellee,

v.

Mary Peggy MOORE, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Lee Roy WILEY, Defendant–Appellant.

Nos. 94–30453, 94–30454.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 23, 1997.

Decided March 31, 1997.

Thomas J. McCabe, Westberg, McCabe & Collins, Boise, ID, for Defendant–Appellant Lee Roy Wiley.

David Z. Nevin, Nevin, Kofoed & Herzfeld, Boise, ID, for Defendant–Appellant Mary Peggy Moore.

George W. Breitsameter, Assistant United States Attorney, Boise, ID, (on the briefs) and Joseph Douglas Wilson, United States Department of Justice, Washington, DC (argued), for Plaintiff–Appellee.

Before: HUG, Chief Judge,
PREGERSON, REINHARDT, BRUNETTI,
KOZINSKI, THOMPSON, O'SCANNLAIN,
TROTT, RYMER, KLEINFELD, and
TASHIMA, Circuit Judges.

TROTT, Circuit Judge.

Mary Peggy Moore ("Mrs.Moore") and Lee Roy Wiley ("Wiley") appeal their respective convictions for conspiracy and for making a material false statement in connection with the purchase of a firearm. Wiley allegedly bought a firearm as a "straw man" on behalf of Mrs. Moore's fourteen-year-old son, Bobby Moore ("Bobby"). Mrs. Moore allegedly was liable as Wiley's aider and abettor and coconspirator in his making of the false statement.

In an attempt to overturn their convictions, Mrs. Moore and Wiley tender three arguments. First, they contend that Mrs. Moore as Bobby's parent consented to the acquisition of the firearm, thereby rendering the government's proof insufficient as a matter of law either to constitute a violation of 18 U.S.C. § 922(a)(6) or to establish the existence of an unlawful conspiracy.

Second, they argue that the district court failed adequately to submit for the jury's determination the question of whether the alleged false statement was material, advising the jury instead that if Bobby and not Wiley was the true purchaser of the firearm, then Wiley had made a material false statement in connection with its purchase. In support of this contention, the appellants direct us to *United States v. Gaudin*, —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), in which the Supreme Court held that the materiality of a false statement offense must be decided by the jury, not by the court.

Third, the appellants assert that the Gun Control Act as it relates to this case is constitutionally vague (1) on its face, or (2) as applied.

Mrs. Moore alleges separately that the district court erred at sentencing in refusing to give her a favorable adjustment for acceptance of responsibility.

1. The opinions of the three-judge panel are re-

Because we conclude that these claims have no merit, we affirm the district court.[1]

I

A.

The Facts

On September 2, 1993, fourteen-year-old Bobby Moore saw a .25 caliber handgun in a pawnshop which had a federal license to sell firearms. When he showed interest in the weapon, a clerk shooed him off the premises because his age rendered him ineligible under federal law to buy it. Undaunted, Bobby set out to find a way to acquire the handgun for himself. He approached his mother to buy it for him, but she turned him down. Bobby's friend Jason Marks witnessed this discussion. Jason's unchallenged testimony about the discussion established not only that Mrs. Moore refused to buy the gun on behalf of her son, but that she explicitly told him he would have to "get someone else" to get it for him because she "didn't want her name on the papers":

A. (By Jason Marks) Well, we [Bobby and Jason] left the pawn shop and we were trying to figure out a way that *he* could get the money to get the gun.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. (By the prosecutor) So what did you do as far as trying to get the money?

A. Well, we walked back to his house and I sat down and he was looking around his house at stuff that he could sell or get rid of to get some money.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Okay. When [Bobby] first talked to Mrs. Moore, he was there looking for something to sell, looking at the boom box. When he first talked to his mom, what did he say? What did he ask her?

A. He asked if she would pawn this for him, and she said, no, and they got in an argument.

Q. Okay, and tell us what else was said.

A. Then Bob said why he wanted to pawn it and stuff, and—

ported at 84 F.3d 1567 (9th Cir.1996).

Q. Did [Bobby] ask her to pawn it or hawk it for anything particular?

A. Yeah, for the gun.

Q. What? For the gun?

A. Yeah, and Bob's mom said she didn't want to do it because she didn't want her name on the papers and he could hurt somebody and she didn't think he needed a gun. But Bob has a way of talking people into things, and so he kind of threw a tantrum and got all mad, and finally his mom said that she would do it.

Q. Said she would do what?

A. Pawn the CD Player.

Q. Did she say she would pawn the CD player for the gun, or just pawn the CD player?

A. *Just pawn the CD player and he would have to figure out a different way of getting the gun because she didn't want her name on the papers.*

Q. That's what he told her; is that correct? *He would have to get someone else to get the gun?*

A. *Yeah.*

(emphasis added).

Mrs. Moore then pawned Bobby's CD player and gave him the cash she received from the transaction. She did so knowing that he intended to use it to purchase a firearm.

The next day, Bobby went looking for someone else to help him acquire the weapon, as suggested by his mother. He took the cash to Wiley's residence to see if Wiley would assist him. The neighborhood knew Wiley as "Grandpa," and he frequently did favors for the neighborhood children. The record reflects that Wiley is a man of limited intelligence. Wiley was neither Bobby's parent nor guardian, nor was he related to him in any respect whatsoever.

Wiley balked at first, but Bobby persisted; and with the promise of money as a sweetener, Wiley relented and agreed to purchase the gun on Bobby's behalf.

Mrs. Moore then drove Wiley, Bobby, and Jason to the pawnshop. During this trip, Wiley asked Mrs. Moore if the purchase of the gun was all right with her, to which she replied that it was fine.

When the group arrived at the pawnshop, Mrs. Moore waited in the car while Wiley, Bobby, and Jason went inside. Wiley asked the clerk to see the handgun Bobby had spotted on his earlier visit. Because the two boys were present, the clerk inquired for whom Wiley wanted to purchase the gun. Wiley responded that the gun was for Bobby, but that he Wiley was Bobby's grandfather, and that he was going to hold it for Bobby until Bobby was 21 years of age. Both of these statements were false and were intended to facilitate the transaction. On cross-examination, Wiley conceded that the only reason he was in the pawnshop was "to stand in for Bobby to get that gun."

The clerk responded to Wiley's representations with an inquiry about Bobby's parents and whether they knew about this purchase. Bobby said that his mother was outside, and he went to get her. In short order, Mrs. Moore appeared briefly in the doorway and, without prompting by Wiley, said to the clerk, "His grandfather is buying a gun for him. He's going to hold it until he's 21, and everything is fine with me."

Satisfied by Mrs. Moore's representations, the clerk had Wiley sign BATF Form 4473 as the "transferee (buyer)," accepted the cash Bobby had given to Wiley for the transaction, and turned the gun over to Wiley. Back in the car, and contrary to the intentions he expressed to the clerk, Wiley gave the gun to Mrs. Moore, expecting that it would go to Bobby. As Bobby intended from the start, he then took the firearm as his own possession.

Mrs. Moore's reluctance to buy this weapon for her son and to put her name on the papers was well founded, and her worry about Bobby hurting someone with it was prescient. On January 20, 1994, Bobby used it to shoot Ronald Wade Feldner, a New Plymouth, Idaho police officer, in the face. Officer Feldner died, leaving behind a wife and minor children.

B.

The False Statement

In 18 U.S.C. § 922(a)(6), Congress made it a federal offense

for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter.

In the same statute, Congress also rendered it illegal for a licensed firearms dealer to sell or deliver "any firearm or ammunition to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age," or to sell or deliver a handgun to anyone less than twenty-one years of age. 18 U.S.C. § 922(b)(1). Thus, federal law made Bobby Moore ineligible to purchase a firearm from a federally-licensed dealer.

The government's theory of its case against Wiley, and against Mrs. Moore as an aider and abettor and coconspirator, is straightforward and simple. As charged in the indictment and as explained to the jurors in the jury instructions, the government alleges that the true buyer of the .25 caliber handgun was the ineligible Bobby Moore, and that Wiley acted merely as his disguised agent-in the parlance, as a "straw man" purchaser. Thus, goes the government's argument, when Wiley the straw man agent signed his name on Form 4473 as the "transferee (buyer)," he made a false statement because the buyer was not Wiley, but Bobby himself. The manifest materiality of this false statement, says the government, stems from the law's prohibition against Bobby buying a firearm.

The appellants, on the other hand, contend that Mrs. Moore consented to the acquisition of this firearm by Wiley on behalf of her son.

They argue here, as they did to the trial court and to the jury, that such consent rendered the sale lawful per se, and accordingly, that any false statements that Wiley and Mrs. Moore made to the clerk were flatly immaterial. To support this argument, the appellants assert that, at the time of sale, transferring firearms to minors was legal in Idaho, so long as the minor's parents gave consent.[2]

The respective positions of the government and the appellants were carefully set forth by the district court in its instructions to the jury:

> The government contends that Mary Peggy Moore is not charged with any unlawful transfer of the firearm to her son, but rather is *charged with aiding and abetting Lee Roy Wiley or being a principal in a straw man purchase* of a firearm in the place of the prohibited minor, James Robert Lee Moore, who the government contends was the true purchaser. *The defendant Mary Peggy Moore denies that she participated in a straw man purchase, or that a straw man purchase took place.*

> \*　\*　\*　\*　\*　\*

> [T]he defendants Lee Roy Wiley and Mary Peggy Moore cannot be found guilty of any charge pending against them in this case solely because they may have delivered the firearm to James Robert Lee Moore.

> The limited charges against the defendants in Count 1 and 2 are that *James Robert Lee Moore was the true purchaser of the firearm and that the defendants served merely as straw men* for the purchase of the firearm in the place of James Robert Lee Moore.

(emphasis added).

## C.

### The Straw Man Doctrine

 The straw man doctrine, which is nothing more than a long-standing construc-

---

**2.** At the time this firearm was purchased, Idaho law did not prohibit the sale of a firearm to a minor so long as the minor had the consent of a parent or a guardian. Idaho Code § 18–3302A (1990). Since these events, the Idaho Legislature amended section 18–3302A to require the *written* permission of a parent or a guardian. The Gun Control Act has also been amended to make it illegal for a juvenile to possess a handgun without a parent's or guardian's written consent. 18 U.S.C. §§ 922(x)(1)(A) & 922(x)(3)(A)(iii) (1994).

tion of the relevant statutes, holds that a person violates section 922(a)(6) by acting as an intermediary or agent of someone who is ineligible to obtain a firearm from a licensed dealer and making a false statement that enables the ineligible principal to obtain a firearm. As we said in *Perri v. Department of the Treasury*, 637 F.2d 1332, 1336 (9th Cir.1981), "sham or 'strawman'" purchases occur "when a lawful purchaser buys for an unlawful one." *See United States v. Lawrence*, 680 F.2d 1126, 1127–28 (6th Cir.1982) (defendants who purchase firearms for ineligible foreign citizens violate section 922(a)(6)); *United States v. Ortiz–Loya*, 777 F.2d 973, 978 (5th Cir.1985) (same). In *Lawrence*, for example, the Sixth Circuit found determinative of straw man status that, like Wiley, the transferee (1) acted under the direction and control of the ineligible buyer, (2) purchased weapons selected by the ineligible buyer with the buyer's money, (3) took a commission that showed agency, and (4) had no intention of keeping the gun for himself. 680 F.2d at 1128; *see also United States v. Howell*, 37 F.3d 1197 (7th Cir.1994) ("The jury was entitled to conclude, beyond a reasonable doubt, that Mrs. Howell was no more than a straw purchaser, an eligible purchaser who is acting as an agent, intermediary, or straw purchaser for someone who is ineligible to purchase the firearm directly.") (internal quotations omitted).

■ In effect, this doctrine is merely an application of a principle that dates back to the time when the legal profession relied regularly on maxims expressed in Latin to illuminate the law: "Qui facit per alium facit per se," or "He who acts through another acts himself." In this context, it is a construction of the statute that directly serves the primary purpose of the Gun Control Act, which is " 'to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.' " *Barrett v. United States*, 423 U.S. 212, 220, 96 S.Ct. 498, 503, 46 L.Ed.2d 450 (1976) (quoting S.Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968) U.S. Code Cong. & Admin. News 1968 p. 4410).

### D.

### Analysis

In an attempt to avoid the implications of the straw man doctrine, the appellants' sole defense was that Mrs. Moore consented to the purchase, and that because of her consent, Wiley and Mrs. Moore committed no crime, period. The defense argued that Wiley was *her* lawful agent implementing *her* lawful decision; he was not a straw man, and thus, Wiley and Mrs. Moore did not violate the statute. In the defense's view, the grandfather ruse was immaterial and irrelevant.

■ Whether the defense is correct, of course, depends entirely on the facts. It was for the jury to decide whose agent Wiley was and whether Bobby was the actual buyer of the gun. If the jurors had a reasonable doubt about whether the buyer was Bobby, they would have acquitted. They did not. Read in the light of the indictment and the instructions, the jury verdict establishes conclusively that Bobby was the buyer, not Wiley, and that Wiley was merely Bobby's straw man agent for the purchase. Clearly, the jury attached no factual merit to the claim that Wiley was the buyer of the gun.

The appellants' argument echoes the failed argument of defendant Somogye in the *Lawrence* case.[3] 680 F.2d at 1127. Somogye admitted that he and Lawrence knowingly purchased guns for an individual who could not legally buy them in his own name, but claimed that because they entered the store and paid for the weapons, as a matter of law they did not lie when they registered themselves on the transaction form as the buyers of the weapons. The Sixth Circuit dismissed this now familiar argument as novel, but "specious." *Id.* at 1127. The court explained that:

> The foundation of Somogye's argument is that he and Lawrence were not agents of Hajjan but were instead middlemen who purchased the guns for resale to Hajjan. Hence, as principles, they were in fact the buyers of the weapons. *This argument*

---

**3.** Lawrence died during the pendency of the appeal rendering moot the case against him.

*does not, however, conform to the facts of the case.* Lawrence and Somogye were at all relevant times acting under the control and direction of Hajjan. They purchased the guns designated by Hajjan and did so with his money. The fixed commission they received further evidenced their role as agents. Therefore Lawrence and Somogye were not buyers and their statements on the forms were false in violation of 18 U.S.C. § 922(a)(6).

*Id.* at 1128 (emphasis added).

In the instant case, the uncontested facts presented to the jury did not as a matter of law establish a defense to the straw man doctrine. Nothing in the statute, the case law, or the rules of statutory construction suggests that a parent can either (1) render an unlawful straw man purchase legal by consenting to it, or (2) override the clear prohibition against making material false statements in a firearms transaction. Appellants ignore the specific rules that apply when someone purchases a firearm from a federally licensed dealer. Their suggestion that Idaho Code § 18–3302A "empowers" a parent to arm a child is misleading and a non sequitur. The fact that Idaho law permits a weapons transfer to a minor under 16 years of age with parental consent does not "empower" a juvenile to purchase a firearm from a federal dealer through an intermediary who falsely identifies himself as the buyer. The gravamen of the charge against Mrs. Moore and Wiley was the allegation that they made a material false statement. The district court properly explained the charge in denying the appellants' motion to dismiss:

> The Court: But [parental authority to give a weapon to a child is] not what we are here about. What we are here about is whether or not false statements were made in connection with the purchase of the firearm, and I don't think the government's case against Mrs. Moore is that she got Wiley to purchase it, who gave it to her, who gave it to her son. I don't think that is an offense. The question being, whether or not she aided and abetted, or engaged in an legal [sic] agreement, conspiracy, to violate the federal law which prohibits false statements in connection with the purchase of the firearm.

There is, of course, ample evidence in the record to support the jury's verdict and their conclusion that Bobby bought the gun for himself through an intermediary. Mrs. Moore turned down Bobby's request to buy the gun for him and refused to go on the papers. She told him he'd have to find someone else. He found Wiley.

Wiley was an archetypical straw man. He was recruited and compensated for his role because Bobby could not buy the coveted firearm and because his mother would not buy it for him. Wiley testified that the boys asked him to do "a favor for them," that they picked it out, and that Bobby gave him the money for it. Wiley's own testimony is dispositive of his role as a straw man purchaser in this matter:

(By Mr. Lindquist)

Q. Okay. You knew that—you knew why they were asking you to buy the gun, didn't you?

(By Wiley)

A. Yes, I did.

Q. You knew what Bobbie [sic] was asking you to buy the gun, didn't you?

A. What [sic] *he wanted to own a gun,* as far as I know.

Q. *Bobbie wanted a gun?*

A. *That's right.*

Q. And you knew that the reason that they were asking you was because Bobbie couldn't buy that himself, correct?

A. Well, that sounds about right.

Q. And so they were asking you, *Bobbie was asking you to buy it in his place, right?*

A. *Yeah, as far as I know, yeah.*

　　＊　　＊　　＊　　＊　　＊　　＊

Q. So the person that was really getting that gun was Bobbie, wasn't it?

A. That's right.

Q. And you knew that, didn't you?

A. Yes, I did.

Q. And you knew that the only reason you were there, the only reason that they

came to you was because Bobbie couldn't get it on his own?

A. That sounds about right.

Q. You weren't interested ·in getting a gun that day, were you, Mr. Wiley?

A. No, I wasn't.

\* \* \* \* \* \*

Q. The only reason that you were there that day was *to stand in for Bobbie to get that gun, correct?*

A. That sounds about right.

(emphasis added). Wiley's involvement in the transaction is the smoking gun that proves both the illegality of this purchase and the existence of the conspiracy. Under the circumstances and given the jury's verdict, Mrs. Moore's words spoken in the pawnshop in support of the grandfather ruse serve primarily to connect her both to the false statement offense and to the conspiracy, rather than to provide the appellants with a defense. In her cameo appearance in the pawnshop's doorway, she did not reveal what was actually happening. Instead, she lied about the transaction in progress, and by so doing, purposefully enabled Wiley to make a material false statement on BATF Form 4473 and thereby consummate an illegal purchase. Her precise misrepresentation about Wiley's status as Bobby's grandfather and about who was going to control the weapon can hardly be called "consent." What the record demonstrates that she said and did does not square with the appellants' characterization of it. Thus, the appellants' argument that the evidence is insufficient to sustain these verdicts is demonstrably without merit.

In conclusion, we borrow again from the Sixth Circuit in *Lawrence:*

The result we reach here is necessary if the intentions of Congress as revealed in the Gun Control Act of 1968 are to be followed. If sales such as this one were insulated from the law's registration provisions, the effect would be tantamount to a repeal of those provisions. Other courts have upheld convictions for gun registra-

tion violations predicated on sham transactions and we must do so here.

680 F.2d at 1128.

## II

### The Instructions on Materiality

■ Moore and Wiley argue that the district judge violated the *Gaudin* rule through its instruction to the jury. *See United States v. Gaudin,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding that the materiality of a false statement is a matter for the jury to decide). Specifically, they challenge the judge's instruction that:

If the government establishes by proof beyond a reasonable doubt that James Robert Lee Moore was the true purchaser of the handgun and that Lee Roy Wiley was not, then the government has established that Lee Roy Wiley made a material false statement in connection with the purchase of the firearm. But I want you to keep in mind the making of a material false statement is just one of the elements of an offense, and I described those elements to you in the earlier instructions.

Jury Instruction No. 14 (excerpt). Because the defense lodged no objection on *Gaudin* grounds to this instruction, we review for plain error pursuant to Federal Rule of Criminal Procedure 52(b).

*Gaudin* involved allegations of criminal false statements on federal loan documents in violation of 18 U.S.C. § 1001. The problem in *Gaudin* arose because the district court handled the issue of the materiality of the alleged false statements—which is an element of the crime—as a matter for the court to decide, not the jury. Unlike the instant case, the trial court instructed the jury that "[t]he issue of materiality ... is not submitted to you for your decision but rather is a matter for the decision of the court. You are instructed that the statements charged in the indictment are material statements." —— U.S. at ——, 115 S.Ct. at 2313.

■ The Supreme Court held that such an approach to the issue and such an instruction violated both the Fifth and the Sixth Amendments to the United States Constitution, which together "require criminal convictions

to rest upon a *jury* determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at ——, 115 S.Ct. at 2313 (emphasis added). The Court concluded by saying that "[t]he trial judge's refusal to allow the jury to pass on the 'materiality' of Gaudin's false statements infringed that right [to have a jury decide]." *Id.* at ——, 115 S.Ct. at 2320. The rule of this circuit is that if such a constitutional error occurs, it is both "structural" and "plain" and therefore requires reversal. *United States v. Gaudin,* 28 F.3d 943, 952 (9th Cir.1994), *aff'd,* —— U.S. ——, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

■ The question we must answer, therefore, is whether the instruction of which the defendants complain withheld the element of materiality from the jury in violation of *Gaudin's* rule. Our answer is that it did not.

Unlike in *Gaudin,* here the court did not withhold the materiality element from the jury. The court expressly instructed the jury that materiality was an element of the charged offense, and that the government had to prove it beyond a reasonable doubt:

> In order for a defendant to be found guilty of [making a false statement], the government must prove each of the following four elements beyond a reasonable doubt: ...; and third, *that the statement was intended or likely to deceive the firearms dealer with respect to a fact material to the lawfulness of the sale; ....* If you find that the government has established each of the foregoing elements against a defendant by proof beyond a reasonable doubt, your verdict should be one of guilty against that defendant on this Count 2.
>
> If you find that the government has not established all or any of the four elements by proof beyond a reasonable doubt against a defendant, your verdict should be one of not guilty on Count 2 against that defendant.

(emphasis added). The court also instructed the jury that "[t]he burden is always upon the government to prove guilt by proof beyond a reasonable doubt."

It is also noteworthy that when the court discussed the instructions with counsel before reading them to the jury, no one objected that the instruction now complained of violated the *Gaudin* rule, a rule established first by a three-judge panel of this court on June 22, 1993 and then affirmed en banc on June 21, 1994, more than two months before the trial. Moreover, the district court offered to enhance the instructions on the materiality element by giving an additional instruction offered by Mr. McCabe, counsel for Mr. Wiley, but Mr. McCabe withdrew the instruction. The exchange between court and counsel during this conference sheds light on this issue:

> Mr. McCabe: The [instruction] I offered was number twelve, which is Devitt and Blackmar, and it says it is material if it is relevant to the decision and is capable of influencing them, and what I'm concerned with there is *if we leave it wide open like that, even though being a grandparent is not truly material to the transaction, they might decide that the false statement that was material was saying that he was his grandfather.*
>
> The Court: I'm willing to give your number twelve.
>
> Mr. McCabe: I will withdraw it at this time.
>
> The Court: All right. Any other exceptions/failure to give, Mr. McCabe?
>
> Mr. McCabe: I don't believe so, judge.

(emphasis added).

Mr. Nevin, counsel for Mrs. Moore, also addressed Instruction No. 14 in this conference, and he too did not object on *Gaudin* grounds. What he said about the disputed language was not that it withdrew the materiality element from the jury's consideration, but that it was "a comment on the evidence."

From these exchanges and from the transcript of the proceedings, it is clear that no one believed during the trial that the disputed instruction withdrew the hotly disputed element of materiality from the jury.

The *Gaudin* issue arose for the first time in a motion for a new trial after the chosen defense had failed. Counsel for Mr. Wiley argued to the court that "materiality is al-

ways an issue that needs to be submitted to the jury ...," to which the court responded, "I did submit it to the jury." To prove his point, the court then read the same instructions to counsel previously quoted in this opinion. Counsel's response was.

I understand, Judge. I concede all of those things. In terms of—and in fact you went further. When the jury came out with a question, you gave them an answer that included, yet again, an instruction to them that the government had to prove beyond a reasonable doubt that, quote, "That the alleged statement was of a nature material to the lawfulness of the sale." I concede all of that, judge.

Nevertheless, counsel made the same point that they make here, namely that the language in Instruction 14 had the effect of withdrawing consideration of this element from the jury's consideration. The court discussed the matter with counsel and then disagreed, denying the motion for a new trial. The record viewed as a whole supports the court's conclusion: the question of materiality remained with the jury.

■ This leaves us, however, with the question of whether the jurors were misled or confused by the disputed language in Instruction No. 14. They were not. During deliberations they sent a question to the judge inquiring about the interplay in the instructions between intent and materiality. This is the question:

Count 2—Third Element [materiality], Instruction # 11.

"That the statement was intended or likely to deceive the firearms dealer ....."

Does the "intention" and "likely to deceive" both need to be met in this element or just one met for this element to be satisfied.

[signed]

One can conclude from this question only that the jury understood that the element of materiality was theirs to decide, and that they were attempting to decide it. There is no sign they believed or did otherwise.

More importantly, however, when the court answered the jurors' question, he told

them again that this essential element was on *their* table for decision:

In response to your question, you are advised that the government has the burden of proving beyond a reasonable doubt that the Defendant under consideration knowingly and wilfully made, or aided and abetted the making of a false statement. The government must also prove beyond a reasonable doubt that the defendant knew the alleged statement was false. *The government must also prove beyond a reasonable doubt that the defendant intended his or her statement to deceive a firearms dealer and that the alleged statement was of a nature material to the lawfulness of the sale and that the alleged statement was of a nature which would deceive the dealer or would likely deceive the dealer.*

... This Instruction sets forth four separate elements which the government must prove beyond a reasonable doubt.

(emphasis added). If the earlier statement in Instruction 14 might have been a problem, this certainly cured it.

Thus, when we view the instructions "as a whole in the context of the entire trial to determine if they were misleading or inadequate to guide the jury's deliberation," *United ed States v. Perez,* 989 F.2d 1111, 1114 (9th Cir.1993), we see clearly that they do not suffer from this defect.

■ There is an explanation, of course, for Mr. McCabe's withdrawal of his enhanced materiality instruction, as well as for both counsels' disinclination to get too close to the materiality issue as framed by the prosecution. As Mr. McCabe candidly admitted at oral argument before the three-judge panel, he did not want the jury precisely to focus on the materiality of the admittedly false statements made by Mr. Wiley for fear that such a focus would distract the jury from the substance of the defense, which as described earlier in this opinion, was that *none* of the statements made by Wiley and Mrs. Moore could qualify as material false statements because no crime was being committed in that Mrs. Moore approved of the purchase. As Mr. Nevin says in his excellent brief,

As we argue above, Idaho law protected the right of *any* third party to give a gun to a child of *any* age, with the parent's permission. Thus the statements that Mr. Wiley was Bobby's grandfather, and that the gun would be held until Bobby turned 21, were in no way "material to the lawfulness of the sale."

(emphasis in original). This tracks exactly the argument Mr. Nevin made to the jury at the end of the case, demonstrating also that everyone involved in the trial considered the materiality element to be in play and not to have been preempted by the court. In fact, materiality was the essence of both defendants' defense. With this in mind, it is pellucid beyond a reasonable doubt that the court's disputed statement in Instruction No. 14 read in context and measured against (1) the evidence, (2) the substance of the defense, and (3) the verdict, was completely harmless. *See Perez,* 989 F.2d at 1115–1116 (holding that jury instructions were harmless beyond a reasonable doubt where the jury was told that "carrying"—for purposes of establishing the offense of carrying a firearm in relation to a drug trafficking offense—was shown conclusively if the firearm was within the defendant's reach). In context, the error, if any, certainly was not "plain," and the disputed instruction did not affect any substantial rights. *See United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993).

### III

### The Constitutionality of the Gun Control Act

Prior to trial, the appellants unsuccessfully moved to dismiss the indictment on the ground that 18 U.S.C. §§ 922(a)(6) and (b)(1) are constitutionally vague. They argued that these sections fail to give adequate and fair notice to a person of ordinary intelligence that certain conduct is unlawful. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). We review this claim de novo, and we conclude that it has no merit.

■ The plain language of section 922(b)(1) unmistakably renders a juvenile in-eligible to buy a firearm from a federally licensed dealer. Section 922(a)(6) makes it a crime to make any false statement in connection with such a purchase. Any ordinary person of reasonable intelligence reading these sections could not help but understand that they prohibit sham straw man transactions designed to obtain a gun for an ineligible juvenile.

■ The Fifth Circuit rejected an analogous argument that section 922(a)(6) was constitutionally vague as applied to a straw transaction in *United States v. Brooks,* 611 F.2d 614, 617 (5th Cir.1980), *overruled on other grounds, United States v. Henry,* 749 F.2d 203 (5th Cir.1984). In *Brooks,* a gun dealer was convicted for an illegal straw sale to a nonresident. The court found the statute's ban on the knowing "sale" to a nonresident to be a sufficiently definite warning of the conduct proscribed by application of the straw transaction doctrine. The court found that the words "sell or deliver ... to any person who ... does not reside in the State" gave fair notice that the defendant could not make a sham sale where he knows the ultimate recipient is a nonresident. 611 F.2d at 617.

Here, section 922(b)(1) reads that it shall be unlawful for firearms dealers "to sell or deliver ... to any individual who ... is less than eighteen years of age." Under the reasoning of *Brooks,* this practically identical language makes it reasonably clear that sham transactions designed to procure a gun for a minor are unlawful. If Wiley was therefore sufficiently warned that the sham transaction he engaged in was an illegal sale to *Bobby,* he can be charged with the requisite knowledge that his answer on the form was deceitful. *See United States v. Crooks,* 804 F.2d 1441, 1448 (9th Cir.1986), (holding that signature on tax form was sufficient to show knowledge that false statements on return were, in fact, false), *modified,* 826 F.2d 4 (9th Cir.1987).

Appellants reintroduce Idaho Code § 16–3302A (1990) into their void-for-vagueness argument. They claim that the vagueness of the federal statute's ban on straw sales to minors is "compounded" by the Idaho law's sanction of sales and transfers of firearms to

minors under 16 with their parent's permission. As discussed earlier in Part I, Idaho law has no "empowering" effect that alters federal law on the prohibition of the straw sale of firearms to minors. Appellants state that a reasonably intelligent person would be confused about the interplay of federal and Idaho law here, but they cite no authority to reinforce their theory that state law can unconstitutionally "compound" the vagueness of federal law. In this regard, we find the holding of the Supreme Court in *United States v. Powell* to be instructive:

> The fact that Congress might, without difficulty, have chosen "[c]learer and more precise language" equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague. *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1541–42, 91 L.Ed. 1877 (1947).

423 U.S. 87, 94, 96 S.Ct. 316, 321, 46 L.Ed.2d 228 (1975). In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* the Supreme Court declared:

> "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." [citations omitted]. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974). The rationale is evident: to sustain such a challenge, *the complainant must prove that the enactment is vague "'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensive normative standard, but rather in the sense that no standard of conduct is specified at all.'* Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). Such a provision simply has *no core." Smith v. Goguen,* 415 U.S. 566, 578, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974).

455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 7, 71 L.Ed.2d 362 (1982) (emphasis added). Here, the extension of the prohibition against the "sale" of firearms to minors to also include straw man purchases for minors is not standardless; it delegates no policy matters to policemen and juries, and most important, it is normatively comprehensible.

The record shows that both Mrs. Moore and Wiley understood their respective legal obligations in this case, even though they unlawfully sought to work around them. Mrs. Moore knew full well that a purchaser's name went on "papers" and that fulfilling that role entailed grave responsibilities she did not want. Wiley, too, was aware of the unlawful nature of his conduct. He clearly appreciated the legal problems associated with arming a juvenile and used a ruse about his relationship with Bobby to circumvent them. When the clerk tried vainly to warn Wiley, who was employed as a private security guard, about the danger of putting even a supervised firearm in the hands of a juvenile and about the "trouble" that could ensue, Wiley's dismissive response was, "I know the law."

In short, we discern no arbitrary or unfair application of the Gun Control Act in this case, an Act clear on its face and in its impact with respect to false statements and juveniles.

## IV

### Acceptance of Responsibility

Mrs. Moore contends that the trial court erred by not granting her a two-point reduction in offense level for acceptance of responsibility. She correctly points out that by putting the government to its proof she did not foreclose such a reduction. U.S.S.G. § 3E1.1, comment., n. 2 ("In rare situations a defendant may clearly demonstrate an acceptance of responsibility for [her] criminal conduct even though [she] exercises [her] constitutional right to a trial.").

█ The presentence report recommended denying such a reduction, pointing to Mrs. Moore's initial lies to law enforcement about her involvement in the acquisition of the firearm and to her denials post-trial that she told the clerk Wiley was her son's grandfather and that he would hold the gun until Bobby was 21. The district court agreed with the presentence report and found that her situation was not the rare one justifying such a benefit.

The findings of a sentencing judge as to acceptance of responsibility are entitled to considerable weight. *United States v. Scarano*, 975 F.2d 580, 587 (9th Cir.1992). We review such a denial under the "clearly erroneous" standard. *Id.* We do not perceive any defect in the district court's decision in this case. We note that Wiley was awarded such a reduction, but that the trial court determined that Mrs. Moore's conduct did not measure up to the required standard. Such a holding was not clearly erroneous.

AFFIRMED.

TASHIMA, Circuit Judge, with whom PREGERSON and REINHARDT, Circuit Judges, join, dissenting:

For the reasons set forth in the panel majority's opinion, *United States v. Moore*, 84 F.3d 1567 (9th Cir.1996)("*Moore I*"), I dissent. The majority errs in several major respects. I briefly address these errors *seriatim*.

### 1. *Mrs. Moore's Consent*

First, the majority refuses to recognize that the uncontradicted evidence establishes that Mrs. Moore consented to her son's purchase of the handgun. That she did consent is demonstrated by "The Facts," Part I.A., *Op.* at 1459, of the majority opinion. According to Bobby's friend, Jason: "But Bob has a way of talking people into things, and so he kind of threw a tantrum and got all mad, *and finally his mom said that she would do it.*" (Emphasis added.) What Mrs. Moore agreed to do was to pawn the CD player.[1] Bobby "would have to figure out a different way of getting the gun because she didn't want her name on the papers." As her later actions demonstrate, this was not a prohibition from Bobby purchasing the gun, it was only Mrs. Moore's refusal to have "her name on the papers." For, as the majority's summary of the facts next states:

> Mrs. Moore then pawned Bobby's CD player and *gave him the cash she received from the transaction. She did so knowing that he intended to use it to purchase a firearm.*
>
> The next day, Bobby went looking for someone else to help him acquire the weapon, *as suggested by his mother.*

*Op.* at 1459 (emphasis added). As the majority further states, "Mrs. Moore then drove Wiley, Bobby, and Jason to the pawnshop." During that trip, she told Wiley that the purchase of the gun "was all right with her," "it was fine." Finally, Mrs. Moore told the pawn shop clerk, "everything is fine with me."[2]

Mrs. Moore consented to Wiley's purchase of the handgun for Bobby.[3] Short of purchasing the weapon herself, there was little else that Mrs. Moore could have done to facilitate the transaction.

### 2. *The Parental Consent Exception*

The majority's second error is to ignore Mrs. Moore's consent and, thus, the central issue in this case-the scope of the parental consent exception. The majority ignores Mrs. Moore's consent to the sale because it does not want to deal with the consequences of recognizing it.

Even the Bureau of Alcohol, Tobacco and Firearms ("BATF") agrees that Congress in-

---

1. This action, of pawning the CD player with the foreknowledge of what the money would be used for, also demonstrates Mrs. Moore's consent. Indeed, as a minor, Bobby could not pawn the CD player himself. That is why he importuned his mother to pawn the CD player for him. In the eyes of the law, both the CD player and the money obtained from pawning it belonged to Mrs. Moore.

2. Moreover, as the panel opinion pointed out, Mrs. Moore's conviction for aiding and abetting could not be sustained, unless she acted "knowingly and intentionally," *i.e.*, that she consented to the transaction. *Moore I*, 84 F.3d at 1573 n. 6.

3. The majority's summary of the facts also shows that Wiley, after purchasing the firearm, did not hand the gun to Bobby, but "gave the gun to Mrs. Moore...." *Op.* at 1460. Thus, not only did Mrs. Moore consent to the purchase of the firearm, according to the majority's summary of the facts (i) the firearm was purchased with her money, (ii) she authorized Wiley to conduct the transaction, (iii) after purchasing the firearm, Wiley handed it to Mrs. Moore, and (iv) it was Mrs. Moore who actually handed over physical possession of the firearm to her son.

tended that guns purchased for juveniles by their parents be excepted from the Gun Control Act's ("GCA") prohibition, and has administered the GCA to recognize such an exception.[4] However, the BATF would limit that exception to transactions in which the parent herself or himself is the purchaser—the "Transferee (Buyer)."

As the panel opinion makes clear, there is no justification in the legislative history to construe the parental consent exception as narrowly as does the BATF, particularly when construing a criminal statute. For the reasons stated in Parts III and IV of the panel opinion, *Moore I,* 84 F.3d at 1571–73, the majority errs in failing to recognize Congress' intent that under the GCA, a parent may validly consent to the purchase of a gun for her minor child without being the physical purchaser.

> Congress simply did not intend to criminalize acquisition of firearms by minors where the parent knows of and consents to the purchase.
>
> The report of the Senate Judiciary Committee on the GCA listed among the serious national problems addressed by the legislation the acquisition of firearms by "juveniles *without the knowledge and consent of their parents or guardians ....*" S.Rep. No. 1097, 90th Cong., 2nd Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N., 2112, 2114 (emphasis added). The report elaborated:
>
> > The *clandestine* acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country. The controls proposed in the title are designed to meet this problem and to substantially curtail it.
>
> *Id.* at 2167 (emphasis added).
>
> The committee report made clear that Congress did not intend to frustrate all gun acquisitions by minors:

> > [U]nder the title, a minor or juvenile would not be restricted from owning or learning the proper usage of the firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian.[5]
>
> *Id.*
>
> There is no indication that Congress intended to limit the exception for the purchase of a firearm for a minor exclusively to purchases made by the parent himself or herself. What the legislative history indicates is that Congress considered parental permission sufficient to allow a third party to purchase the firearm on behalf of a minor. The Senate Judiciary Committee's report clearly indicates that Congress' purpose was only to prohibit those acquisitions of firearms by minors that are "clandestine" or made "without the knowledge and consent of their parents."

*Moore I,* 84 F.3d at 1571–72 (footnote omitted).

### 3. *The Jury's Finding*

The majority also errs in pretending that the pivotal issue was fairly presented to and decided by the jury. The majority sets up a straw man and knocks it down. Under the majority's hypothesis, the issue, which "was for the jury to decide," was whether Wiley was Mrs. Moore's agent or Bobby's agent. Part I.D., *Op.* at 1461. That, of course, is not the issue.

As the instructions quoted by the majority show, if Bobby was the "true" purchaser, defendants were guilty as straw purchasers:

> The limited charges against the defendants in Count 1 and 2 are that James Robert Lee Moore was the true purchaser of the firearm and that the defendants served merely as straw men for the purchase of the firearm in the place of James Robert Lee Moore.

---

4. No party has cited and the court has not found any reported case in which a straw purchaser has been prosecuted for buying a firearm for a juvenile where the straw purchaser is a parent or other close relative of the juvenile.

5. The transaction at issue here meets this description-the firearm was "obtained for the minor" by Mrs. Moore through the arrangements that were made with Wiley with her substantial assistance and consent.

Part I.B., *Op.* at 1460. This instruction completely foreclosed the jury from finding that defendants were not guilty under the parental consent exception, if the jury found that Mrs. Moore had consented to Bobby's purchase of the handgun. Thus, it is disingenuous to say that the issue was submitted to the jury for its determination.

### 4. *No False Statement*

According to the government's theory of the case, the only material false statement made was made by Wiley when he signed the BATF form stating that he was the "transferee (buyer)."[6] This statement was false, according to the government, because Bobby was the "true" purchaser and Wiley was a "straw man." However, even under this theory, under the BATF's own interpretation of what its own forms and regulations require, Wiley was *required* to state that he was the "transferee (buyer)."

According to the testimony of BATF Special Agent Sterling Nixon, when a parent purchases a gun for her child, even with the child's own money, she is *required* to list her own name as the "transferee (buyer)".[7] BATF Form 4473 simply is not designed to accommodate a straw purchase, whether or not it is lawful.[8] There was no place on the form where Wiley could have disclosed that he intended immediately to transfer the gun to Mrs. Moore, for eventual transfer to Bobby. Wiley did not make a false statement. He was, in fact, the "transferee (buyer)" and listed himself as such. Because he fully complied with the requirements of the BATF form and the form nowhere required disclosure of the "straw" aspect of the transaction, Wiley did not make a false statement by listing himself as the "transferee (buyer)," unless that action were criminalized by the "straw man" doctrine, discussed below.

Further analysis of the BATF's design[9] and administration of its Form 4473 demonstrates the "Catch 22" in which straw purchasers are placed. According to BATF Agent Nixon's testimony, straw purchasers are required to list themselves as the "transferee (buyer)," even though they are standing in for the "true" purchaser, *e.g.*, where a parent is purchasing a firearm for her child. Thus, in the BATF's view, straw purchasers are required to make a false statement. The BATF then, in its discretion, determines whether or not that false statement is material, *i.e.*, whether or not Congress intended that transaction to be exempted from the BATF's "true" purchaser requirement. Whatever the merits of such an administration of the GCA for regulatory purposes, it is hardly a fair way to administer the criminal law.

### 5. *The Straw Man Doctrine*

Although not directly acknowledging it, the majority seems to recognize that the "straw man" doctrine is a judicially-created gloss on the GCA—it imposes criminal liability where there is none under a plain, strict reading of

---

6. The majority never precisely identifies the material false statement charged in this case; however, the government made clear at oral argument that the *only* statement it was relying on as false *and material* was Wiley's identifying himself as the transferee (buyer). This is confirmed by the materiality instruction quoted by the majority. Part II, *Op.* at 1463–64.

 Throughout its opinion, the majority implies that Wiley's statements that he was Bobby's grandfather, and that he would hold the firearm until Bobby was 21 were material. However, they clearly were not material to the lawfulness of the sale. First, no one contends that the GCA authorizes a grandparent to act as a straw purchaser for his minor grandchild (absent a parent's consent). Second, neither does anyone contend that a minor may purchase a handgun if he promises that an adult will retain possession of it until he turns 21.

7. Agent Nixon further testified that this required listing of the parent's name as transferee (buyer) would be true even if the parent intended immediately to transfer the firearm to her child, and that it would not be a false statement.

8. As noted in the panel opinion, not all straw transactions are illegal. *Moore I*, 84 F.3d at 1570. The paradigmatic straw transaction is, of course, the legal stand-in of a parent for her or his minor child.

9. The contents of the form are controlled by the BATF. *See* 27 C.F.R. §§ 178.21 (authorizing Director of BATF to prescribe forms), 178.124(f) (prescribing contents of Form 4473). Presumably, therefore, the BATF could require straw purchases, including those for minors with parental consent, to be disclosed on the form. Apparently, it has elected not to do so.

the statute. We agree that it is a proper and useful doctrine. *See Moore I,* 84 F.3d at 1571. Where the majority errs, however, is in the doctrine's application, in deferring to the BATF to dictate its scope in construing the parental consent exception, when the BATF's construction is clearly at odds with Congress' intent. *See Moore I,* 84 F.3d at 1572–73 (Part III).

The application of the straw man doctrine to this case is bizarre and perverse. Mrs. Moore has been convicted of having aided and abetted the acquisition of a firearm by her son. Under 18 U.S.C. § 2, she is liable "as a principal." But, as a principal, as even the government concedes, she had the right to purchase a firearm for her son. Thus, she stands convicted of having aided and abetted an offense for which she could not have been convicted of as a principal.

The majority concludes its defense of applying the straw man doctrine to this case by borrowing from the Sixth Circuit:

> The result we reach here is necessary *if the intentions of Congress* as revealed in the Gun Control Act of 1968 *are to be followed.*

*United States v. Lawrence,* 680 F.2d 1126, 1128 (6th Cir.1982)(emphasis added). The majority, however, has pointed to no such intent. Application of the straw man doctrine here does not follow "the intentions of Congress." No reported case has ever applied the straw man doctrine to criminalize the sale of a gun to a minor with a parent's consent. As we have demonstrated, Congressional intent compels exactly the opposite conclusion. The majority's novel application of that doctrine to this case does violence to the intent of Congress.

This court should not default to the BATF, or any other Executive Branch agency, the power to construe our criminal laws in derogation of the intent of Congress. Congress did not intend to criminalize the sale of a firearm to a minor, where the sale is made with the consent of the minor's parent. If, as it should be, the underlying transaction is seen as one within the parental consent exception, then the sale was lawful and any false statement made to facilitate it could not have been of "any fact material to the lawful-ness of the sale," within the meaning of 18 U.S.C. § 922(a)(6).

For these reasons, I would reverse the convictions. I respectfully dissent.